Our next case is No. 24-1072, RECS Medical, L.P. v. Intuitive Surgical, Inc. Okay, so Mr. Roberts is going to handle the damages appeal, and Mr. Mills is going to handle the cross appeal. That's correct, Your Honor. So we'll have separate timers for the two of them. Okay, Mr. Roberts. Good morning, Your Honors. May it please the Court. John Roberts from Proskauer Rose on behalf of RECS Medical. In the case below, a jury unanimously found that Intuitive infringed RECS Medical's medical device patent, and it rejected each of Intuitive's arguments challenging the patent's validity. The jury also found that the infringement caused RECS Medical $10 million in damages. Let me ask you, since time is limited, let me just ask you. I've seen hypothetically that we were to agree with what the district court judge said and did with respect to damages, her Daubert analysis, her non-Jamal Jamal, her analysis there. So what we're left with, what do we do now? And your basis for a new trial, you say under these circumstances, you get a new trial and you get to, in your brief you say, and reopen the record so that you could bring in, what, new damages experts and get a complete do-over with a whole different case on damages. Is that what you think you're entitled to, and if so, why? Not necessarily, Your Honor, but just to be clear, and I know you know this, but we disagree with the Daubert analysis. We think also that the jury vertical support it. But assuming that you affirm the district court on those grounds, the patent statute requires that a prevailing patent owner be awarded no less than a reasonable royalty. In the Motorola case, which is... Let's assume they don't put on a case that establishes what that reasonable royalty rate consists of. Let's assume there's just no information in the record in which one could plausibly find that this was the amount of the royalty rate. What does one do then? Nominal damages? Do you agree there's such a thing as nominal damages in this context? There is such a thing as nominal damages, Your Honor, but here the jury was the fact finder. And what the jury heard was that there was a license that all the parties agree was comparable, the Covidian license, in which Covidian paid $10 million. The jury also heard... Let's assume that we, in the interest of time, we've read the brief, so we're not giving a short trip to your argument. I just need to move on. I think it's important to understand what the jury heard because this is not a nominal damages case. The record is inconsistent with the idea of nominal damages. But we're trying to assume that you're wrong on the Daubert motion and that the district court properly said that the expert could not testify, that there needed to be apportionment, there wasn't any apportionment testimony, and under those circumstances she granted a remittance. You, both sides, seem to ignore the fact that under prevailing Supreme Court law, if there's a remittance, there has to be an opportunity for a new trial. That's absolutely right. Well, you haven't made the argument very well. That is in our brief, Your Honor, under the Hessel case. We're giving the district judge the benefit of the doubt here. I'm sorry, I asked you a question. Sorry. Where do you think you made the argument that there was an error because the district court granted remittance without giving you the alternative of a new trial? We cite the Hessel case in our brief, which is the Supreme Court case. I understand. You don't, citing a case doesn't often alone make an argument. And so could you explain to me? I can look at the pages in your brief with you. Sure. And you can tell me why you think the paragraph you have on this, which I have flagged in my brief, was sufficient. So, we are interpreting what the district judge did as effectively awarding zero damages. Are you interpreting that as effectively being JAMAL, even though she used the word remitter? It was a JAMAL motion on no damages, and that's what she granted. So you think she granted JAMAL. Correct. And then she just mislabeled it remitter. Correct. That's the argument we're making. Yeah, remitter is something different, right? A remitter is when you have an excessive verdict in somebody, if she had pared it down to 2 million or something. Correct. She called it a remitter. She didn't call it JAMAL. She didn't. In fact, I think she specifically denied the JAMAL motion. Is that not correct? Is my recollection not correct? I'll have to look back at her exact words. Wait, wait, wait. You don't know what happened? The other side made a motion. Just show me where this ruling appears in the record, okay? Yes. We need to figure out what the ruling was, and you don't seem to know. So the ruling, it appears at page 341 of the record. Are you talking about here? I believe the record is wholly lacking in evidence that would allow the court to determine a reasonable royalty. Correct. Is that JAMAL-type language in your view? So I want to be clear about a couple things. If this was a remitter, this is a very easy case because under the Hetzel case, as we cite in our brief, the judge was not permitted to pick a different number, right? The jury was the fact finder here. But isn't there a difference? Don't we have different buckets in the law and in the rules? There's a remitter, and that's for excessive damages, and you need a new trial because somebody's juggling the numbers. Nominal damages, then there's a category of nominal damages, which seems like your view is, and I think I agree with that, it's kind of like almost a zero royalty. Yes. It's not a remitter. $1 nominal damages is different than a remitter, correct? That's the position that we were giving the district judge, the benefit of the doubt, because remitter under these circumstances would clearly violate the 7th Amendment. So you were giving the benefit of the doubt. In other words, whether she used the wrong term, it's clear when you read the record, she was not talking about recalculating it to $1 million. She was calculating it, well, you say 100 times in your brief this was effectively a zero royalty. Effectively zero, correct. So that you're sort of, whether it's not, you're putting remitters in one bucket. This is not really a remitter, notwithstanding what word she chose to call it. And then you've got this other bucket of nominal slash zero royalty. Correct. That's exactly right. And just to be clear, if this was a remitter, this is a very easy case. Okay, but look, at 344, she says, defendant's motion for judgment of a matter of law or an alternative for a new trial and or remitter is granted in part to the extent it seeks remitter of nominal damages and denied in part in all other respects. That looks to me as though what she thought she was doing was granting a remitter and not granting JMO. Well, I mean, it does say the motion for judgment as a matter of law is granted in part. That's also part of that sentence. No, it says to the extent it seeks remitter of nominal damages and denied in part in all other respects. So here's, I think, the right way to analyze this. If this was a remitter in which the judge decided that record doesn't support $10 million, I think, in my view of the facts, the record supports a $1 damages, that's a Seventh Amendment violation. But you view her as not granting a remitter but as granting JMO. If the court wants to decide that way, I think we argued it both ways. Don't talk over me. I'm sorry. Your argument is it's not a remitter, it's JMO, right? In our brief, we argued it both ways. We argued that to the extent this was a JMO. Which is it? Which is it? You said earlier in your argument it's JMO. If I'm reading what you're pointing out here, Your Honor, and I think you absolutely can read this as remitter, which would be a Seventh Amendment violation. What's your relation as to how it should be read? That is a, based on what's written here, I think you're right, that that's how it should be read. It's a remitter. Yes, and that is a Seventh Amendment violation. But does it satisfy the rule, the definition of remitter, as we all understand it in terms of it? And do you think that's the way she understood it? I mean, the alternative could be she used the wrong word. That was in the motion, and she used the wrong word, but she also repeatedly says remitter for nominal damages of $1. So it seems to be her analysis of remitter is that those are the same things, and that's not the same thing. And that's why we argued it both ways, Your Honor, because I think the remitter issue is very easy. It is a clear Seventh Amendment violation, as we argued in our brief. To the extent that what she did was a j-mal, that she believes that the record compels a conclusion that there are zero damages, we explain why that is wrong as a matter of law. So either way, whichever way you look at it, there is reversible error here, and that we are entitled to a new trial. The remitter is not usually the proper label to use for something when you're talking about nominal damages, right, or $1 or $0. Normally, for that small amount, it would be j-mal, right? That's correct, Your Honor. And on the other hand, okay, that's it. That's the amendment. Thank you. All right, you're into your rebuttal time. Do you want to save? Since I'm throwing my time, I'd prefer to save the time for rebuttal. Okay. Okay, thank you, Your Honor. Ms. Bronswick. May it please the Court, I want to— Did the district court grant a remitter or j-mal? I think the district court granted j-mal. I think notwithstanding the language that was used, I want to first point out Rex's saying today that they argued these things in the alternative in their brief. I don't think that's a fair reading of the briefing. They have one sentence at page 47 of their opening brief and one footnote at, I believe, it's page 20 of their reply brief. They do not go into this argument in any detail. Rather, what they said to this court was essentially that the district court would not have had the authority to reduce the $10 million to some other number, as in the Hetzel case. In other words, it would not have had the authority to do a true remitter. I think everyone else is in agreement that what the district court did was grant j-mal. The language that, Your Honor, Judge Prost pointed to in Appendix 338 makes that clear. Her finding is substance— It's j-mal equivalent. So we know we've got remitter at one end, but then we've got what she said repeatedly, more so than remitter, was nominal damages. And, in fact, in her judgment, final judgment, she doesn't use the word remitter, but she does say nominal damages of $1. Is that the same thing as a j-mal? In this case, I would say yes. I think what is clear is that what the district court thought is what she said in Appendix 338. There was no evidence at trial that would allow the jury or the court to ascertain the value of the 650 patent based on the Covidian license. And the authority that she cited at page 33— It's later in her opinion. I think it's 3344, right? She relied on this court's decision in TXEC, which is the decision rejecting the statutory argument that Rex has presented to this court and holding the— J-mal's motion, right? I mean, was every case that she cited a j-mal case? Yes, Your Honor. And TXEC, yes, it reduced the damages to zero, not $1. But, you know, Rex, again, repeatedly on their brief and here today, has said that the $1 that the district court awarded was the functional equivalent of zero. In substance, what she's done is found a lack of proof of damages. If the problem is between $1 and zero, and the court thinks that zero was the right answer, it's certainly within this court's authority to vacate the $1 award. The problem seems to be her repeated use of the word remitter, which means something different and has different legal consequences. So what do we just say about that? Are we going to say it's harmless error and to use the wrong word? Or are we supposed to send it back to her and say, this is what we think you meant, and we think you may have misused the word remitter. What do you think? Is a remand necessary, or can we just surmise it from the rest of the record? I think it's, you know, at most, harmless error. I don't think there's anything to surmise. Again, the substance of what she was doing was clear, and I'd refer to this court's decision in the Lindeman case, which has been cited in the briefing. There, this court said, yes, the district court used the term nominal damages. That isn't quite right because there was an award of $10,000 in damages, but said even though that's the word the district court used, that wasn't what it meant. And so this court didn't feel the need to send it back in that case. I think the same result would be appropriate here. Do you think the judge, I mean, they make a lot of their briefings about how you have to give something under reasonable royalty in 284. Do you think that's why the judge picked nominal damages as seemingly to suffice the statutory argument they make here? I think that's a plausible interpretation of what she was doing. Again, the one thing that is absolutely clear that we know this district judge thought was that there was no evidence in this record, that the evidence applying the standard was critically deficient of the minimum quantity of evidence from which a reasonable jury could award royalty, could assess the value of the 650 patent in the hypothetical negotiation. Okay, but let's address that question for a moment. Let's assume for the moment that we're dealing with a license agreement which dealt only with the two patents because there is evidence that the other patents didn't contribute to the $10 million royalty amount. So let's talk about the 650 and the 892. Why couldn't the jury conclude from that license agreement that at least some significant value was attributable to each of these patents and that each of the patents covered essentially the same technology, which seems to be the case? And while a $10 million award wouldn't be justified because that wouldn't apportion between the two patents, why couldn't the jury assume that a 50-50 division of the royalty amount between the two patents was a reasonable approach? It's not what they did, but isn't that some evidence that would support a royalty award even without expert testimony about it? It's not, Your Honor. And again, the problem here is not the lack of expert testimony, it's the lack of any evidence, expert or otherwise. We obviously disagree that it was proper for the jury to have excluded all of the other patents, but assuming that we're just talking about the 650 and the 892, there is nothing in this record, the trial record, that would allow the jury to distinguish between those two patents. Doesn't the trial record say that they were directed to the same technology? No, Mr. Kidder's report said that. That is not in the trial record. There's no testimony at all saying that they're directed to the same design or anything? No, Your Honor, and again, that's the choice that Rex Medical made. They had had their theory rejected at Daubert, and yet they went forward with a fact witness who presented the same theory but knew even less about the Covidian license than Mr. Kidder had and presented less evidence to the jury. Another thing that this report pointed out— How did that fact witness characterize the two patents? He didn't. He said he hadn't read them. This is Mr. Carter, Rex's president. He had not read the patents. He knew nothing about the patents. He said, I'm not an expert. And again, I think his key testimony is at Appendix 11481. He was asked, do you think that you could put a value on the 650 patent? He said, I think it could be done by experts. He was asked, but not by you, quote, not by me. He says, I can't put a value on the 650 patent, and Rex put nothing else before the jury that would allow them to do so, including, you know, again, I want to focus on the difference between what was in Mr. Kidder's report and what was presented at trial. I want to clarify an intuitive put forth. No expert testimony or anything else on damages. Correct. It was not our burden to do so. And so once they chose not to present a viable damages case, it wasn't our obligation to have our expert show up again. They could have pre-trial asked to call our expert in their case, and they considered doing so. They chose not to. They pursued a reconsideration motion that just asked the district court to change her mind. It seems like a lot of this is about the 892 and the 650.  Was their argument, because I think that's what they say in their brief, that either one of those would support the 10 million. It wasn't that 50-50 or together. It was that there are two patents in the portfolio. I guess they're close enough so that either one of them would have sufficed. Yes, Your Honor. Again, that was Mr. Kidder's theory that was flawed. Mr. Carter didn't even get that far, but it was flawed on Mr. Kidder's part. Who didn't testify. Who did not testify, but in his report, which they're challenging the exclusion of, the one thing he said about those patents, he had one sentence that's in Appendix 3853 to 3854. He says they cover the same stapling innovation with design differences. Of course, those design differences are going to make all the difference to a licensee evaluating the scope of each patent against its products. If they cover the same technology, you would think that in order to practice that technology, you'd have to have a license to both patents. Not necessarily, Your Honor. There are differences between the claims. This is not in the record because Rex didn't do its job and present this evidence. I'm assuming if they were the same, wouldn't you want to have the rights to both of them so you didn't have to have a second lawsuit? There may be cases where that's correct, Your Honor, but then someone needs to say that, and that's what Mr. Kidder didn't do. He didn't analyze the difference between the two patents. He didn't have Rex's technical expert do so. He just treated them as a functional unit, saying that most of the value in the Covidian license was likely in either one. Can I ask a sub-point on this, and I think the district court judge hit this at least in a footnote. Even just the 650 patent, certain of the claims had gone down during the IPR after the Covidian license, and the only claim left was Claim 6, but the others all went down in the IPR. So with respect to the 650 patent, we're still looking at a different valuation, a different claim. Was there any evidence in the record about how the various claims should be apportioned given that most of them went down in the IPR? There was no evidence in the record. I want to be clear, it's not just Claim 6 that survived the IPR, but, for example, Claims 4 and 5 were invalidated in the IPR, and we're not advocating a rule that you have to do claim-by-claim apportionment in every case, but that difference made a difference in this case. Mr. Kidder's opinion for why the 650 patent would be particularly valuable was because it had an I-beam, and an I-beam is necessary in the accused products. The claims that just cover an I-beam without more, Claims 4 and 5, were invalidated, and so it made a difference to the basis of his opinion. Of course, again, his opinion never even got to the jury. The jury heard none of this. The jury heard nothing about, you know, even if you thought that you could treat the 650 and the 892 patent as a functional unit, the jury heard nothing to compare the amount that Covidian paid versus Intuitive, right? They heard Intuitive's sales from 2018 to 2022. There was a stipulated fact. They heard nothing about Covidian's sales, and as the district judge pointed out, Appendix 11780, she says, I don't know. Right, so Intuitive's sales were $607 million in those 4 years. She said, I don't know. Did Covidian have $5 billion in sales? What is the jury supposed to do with that? Right, there's no way to translate. The jury heard nothing about Covidian's sales. One of the undertones, I think, in the appellant's brief is that all of the ruling, excluding its expert's testimony, was 4 days prior to trial. What role, if any, does that play here as we think about these issues and the failure to provide evidence to the jury? I think if Rex had made different choices, it might play a different role. Here, they didn't choose. They had many options available to them. The district court, in her opinion, referred back to Appendix 11792 to 793, where she outlined many of the things that they could have done. One that's not in there, but that certainly was open to them, they could have asked for a continuance if they were concerned about the timing. They didn't do that. They could have still brought Mr. Kidder to trial, who could have, for example, he was precluded from testifying to his opinion about the Covidian license. He was not precluded from talking about Covidian's sales, which was in his report. That's one of the things that didn't go to the jury. He, of course, had another opinion on the Boston Scientific license. It was not just a benchmark. Your Honors have his report in the appendix. You can see that he did a full Georgia-Pacific analysis on it. They could have asked to call our expert. They could have brought fact witnesses. They could have put some evidence into the record that would have allowed a reasonable jury to value the 650 patent. They didn't do so. Did the district judge say that he couldn't testify about the license, or he couldn't testify about the license without apportionment? She held that he couldn't testify to his opinion about the Covidian license because it was unapportioned. Where's the ruling on that? That's at appendix five to six. Five. Five to six. Five to six? Yeah, it's at the very beginning of the opinion, is the Daubert grant. And the T language is at appendix six. The court finds that Mr. Kidder's methods in relying on the Covidian license are unreliable and must be excluded. The court will grant this portion of defendant's motion. And then she, in her JMO ruling, comes back to this and explains, again, the scope of her ruling. I am nearing- Would he have changed his analysis to actually apportion at that point, or would that have been too late because you wouldn't have had an opportunity to take a deposition and all of that? We don't know the answer to that question because, again, Rex didn't ask- What did he say in this expert report? About which- About apportionment. Did he just- So, as to the patents, aside from the 650 and the 892, he relied on two things. Okay, but I'm just talking about these two. About these two, he has one single sentence, 3853 to 3854. It's the sentence I quoted to Your Honors earlier. It is that they cover the same stapling innovation with design differences. Again, he didn't look at any of the other patents to see if those also covered the same stapling innovation. He didn't look at whether Covidian was selling products outside the United States that embodied that stapling innovation. Why shouldn't he be permitted to testify that they covered the same technology? Because he doesn't do anything with that. There's a difference between what he says in his report and what Rex argued to the district court, right? And this was the basis for the district court granting the Daubert motion at Appendix 5. Rex says that the opinion he gave was, look, these are the same basic invention, and so a license to one, once you have a license to one, the other adds marginal value. That's not in Mr. Kidder's report. That is Rex's attorney argument. All he said were they're different design choices. And again, the implication from that is that the scope of the two patents would matter differently to different companies with different products, different aspects to the claims. The 892 patent claims require a handle. The 650 patent claims, unlike the 892, require both of the upper and lower portions to be inside the jaws of the device. The 892 doesn't. I think it's instructive, right? By the time the Covidian license was entered, Rex had dropped the 650 patent against Covidian. In our case, they dropped the 892. That suggests that there is a difference between the two. And despite Mr. Kidder's emphasis on which patents are asserted, which patents are asserted, he knew that 892 was, excuse me, the 650 was no longer asserted against Covidian by the time of the license. He didn't account for that distinguishing fact. OK. Unless there are further questions about damages, we'll give you five minutes to address the cross-appeal. Yes, Your Honor. Thank you. And of course, the court need not reach. Could you reset the time? Damages. If it agrees with us that intuitive does not infringe or that Claim 6 is invalid, we've laid out three different bases for this in our briefing. I'm happy to address any of the- Wait, wait, wait. Hold on. You have to run the clock. Give her five minutes and run the clock. Thank you. Thank you, Your Honor. I'm happy to address any of the three, but I'd like to propose starting with the construction of lower portion. The Claim 6 recites a beam that has- You said we don't need to address these issues if we include you on damages? No, Your Honor. I want to be very clear. If the court agrees with us on liability, it does not need to reach damages. Even if the damages- Even if the court affirms on damages, the liability issues are still alive. The court can- If the court- This was a counterclaim and not an affirmative defense. I'm sorry. No, never mind. Invalidity. The invalidity, I believe, was a counterclaim. Yes, Your Honor. If the court agrees with us on any of the three grounds of liability, then it would be reversal, and then the court would not need to reach damages. So turning to lower portion, right? The claim- I'm sorry. I'm looking at the clock, and I'm not sure that's correct. Okay. Thank you, Your Honor. Claim 6 recites a beam with three distinct parts, three distinct structural components that serve three distinct functions. It distinguishes between the upper and lower portions of the beam, and then the web that is coupled between them, the district courts. Claim construction, however, did not allow the jury to distinguish between those two. She said at Appendix 11387 that the lower portion may include additional materials or structures that extend in a perpendicular direction beyond the lowermost section of the beam. When you have a comprising claim, and you have rather vague language like lower portion, how can we read the specification into the claim? I feel like you're asking us to read, you know, the preferred embodiment into the claim. I disagree, Your Honor. I think this is a classic case of interpreting the claims in view of the specification. The specification exclusively and repeatedly depicts a beam in an I shape, in other words, two horizontal bars that are parallel to each other, and a vertical bar that's coupling them. Whether you want to say it has to be the term I beam or not, in substance, it comes down to the same thing. The spec consistently, at columns five and six, those are the places where it discusses the beam. It exclusively discusses this I shaped configuration and calls only that bottom part running horizontally the lower portion. Also, the spec makes clear that the function that those perform, right? The lower portion. Is that a lexicography argument that you're making? You know, lower portion of the beam means this horizontal line? I don't think we even have to get to lexicography, right? Lexicography and disavowal come into play if you're trying to depart from the plain and ordinary meaning in view of the specification. And here our position is just that the person of ordinary skill reading this specification would understand the beam to have this I shape and the lower and upper portions to be these two horizontal parts. I look at this claim and I think to myself, you know, they don't want to limit themselves to an I beam. They use the land beam. And they don't want to limit themselves to, you know, the preferred embodiment, so there's some wiggle room there. It's not a preferred embodiment, it's the sole embodiment. And again, the function that these things are describing is consistent with the shape, but at minimum, I would say, right? There's a reason RETS isn't defending the district court's actual construction on appeal and is instead proposing a different one because the problem with the district court's construction is it does not allow for any distinction between the lower portion and the web. You can include materials that extend in a perpendicular direction beyond the lowermost section. How far up the web can you go? How is a jury supposed to know how to distinguish between these three separately claimed components? It doesn't allow you to do so. Neither does RETS's construction, which is just, oh, it's whatever is below the web. There's simply no way to figure out what is the lower portion. And that matters because the claim assigns particular functions to the lower portion. And so to figure out, you know, if you're a potential infringer and you're looking at this claim, how do I know how to stay outside of it? If you can't tell the difference between the lower portion and the web, you can't do that. Can I just go back to your first point? Why would we reach, if we hypothetically agreed that there was a J-mall, zero damages, I can see why we would reach the validity case because that goes further. But why do we care about whether the rightness is the wrongness of the infringement judgment? It's a different thing. I'm sorry, Your Honor. RETS is still, the 650 patent is expired, but RETS is still asserting this and related patents. It filed a lawsuit as early as the beginning of this year, and so Intuitive does not want to risk any kind of effect of the liability judgment. Which covers a different time period. No, Your Honor. Right, we're still within the six years of the... No, no, no, but the infringement allegations in this case cover what time period? It starts in 2018. It goes up to the present? Yeah, to the expiration of the patent, which was 2022. I'm not understanding how the other case is different then. The other case is against a different company. My point is that RETS is still asserting patents in these families. We don't know what they're going to assert against... But it's not your company. Not right now. We don't know what they're going to do in the future. The problem is we're still in a period of risk. I'm not understanding this. Why do we care about the other case? If there's no liability against your client, why isn't the issue, as Judge Prost suggested, the issue of infringement moot? If the court wants to vacate the infringement verdict as moot in light of the no damages, we would happily accept that. What we don't want is an affirmance of the liability verdict just because the zero damages is affirmed. There are consequences that could flow from a judgment of liability. And so the point is we believe the liability verdict is wrong for the reasons we've laid out. But at minimum, yes, the court should vacate it as moot. All right. We'll give you a minute for rebuttal. Thank you, Your Honor. So, Mr. Roberts, you're going to address damages. You've got about five minutes. How do you want to divide the time? Your Honor, if I may, may I please ask the court just very briefly on the claim construction issue? No, no, no, no. We'll hear from Mr. Roberts first on the damages. How do you want to divide the time? We've got five minutes. I'll take three if I could. Three and then two?  Yes. Good morning again, Your Honor. It's John Roberts from Prospero Rose. I just wanted to... You need to start running the clock. I just want to respond to a couple of points. There was a question about whether remand was necessary. And I think the answer is, as I said earlier, whether this is a remitter, which it would violate... If it were a remitter, it would violate the Seventh Amendment and we're required to get a new trial on damages. If it was a JMAL, then the district court erred because the evidence doesn't compel the conclusion that zero is the only reasonable royalty. Why is that? Because there was evidence at trial that the jury heard that Covidian paid $10 million for a license to the 650 patent in addition to other patents. There was also testimony from Mr. Carter, which we cite in our brief, in which Mr. Carter explained that it was the 650 patent and the 892 patent that drove the value for Covidian of that $10 million. That evidence shows that... And also Mr. Carter testified that the two patents were in the same patent family. What that evidence shows is that a license to the 650 patent has some value under those... Isn't it your burden to demonstrate what value... If you've got 100 patents in a portfolio, we can assume likely that each one of them has some value. But that's not enough to support a jury verdict. Understood, Your Honor. And we believe Mr. Kidder did the necessary apportionment. I'm putting that aside for now because I know this is a hypothetical question you're asking. Mr. Carter, though, explained that from Covidian's point of view, it was those two patents that are in the same family that were driving the value of the $10 million. What that shows is that zero is not a reasonable royalty under those circumstances. So the jury, who was the fact finder here, determined that $10 million was a reasonable royalty. Now, if the judge... No apportionment of... You know, it almost assumes that the apportionment was okay because there was nothing. No apportionment of the foreign patents. Weren't there 32 patents listed? Yes, but what Mr. Carter testified was that it was the 650 and the 892 that, from Covidian's perspective, were driving the value. Those were the two that Covidian cared about. So we would have to... So the jury would have had to surmise that the two of those were identical and of equal value independent of one another to satisfy the $10 million. Not necessarily. There was other evidence in the record suggesting that Intuitive would value these patents more than Covidian would. So, I mean, this court's case law is clear that damages is not a precise science. The jury, hearing all of this evidence, that Intuitive would have valued these patents more, that Covidian put all the value in those two patents, which were in the same family... And what about the fact that the 650 was a different... A lot of the claims had been struck. I know we don't do it on a claim-by-claim, but shouldn't that come into the discussion? I think the answer is that claim-by-claim apportionment has never been required by this court. What this court requires is for the jury to have a basis for ascribing a certain value to a particular patent, and Mr. Carter's testimony gave them that. And what this court's cases also say is the only situation in which a court, as a matter of law, can award a zero royalty damages is if the record compels that conclusion. The court was not the fact-finder here. The jury was the fact-finder. The jury heard the facts, and the jury determined that $10 million was a reasonable royalty. Okay, but we're assuming that's wrong and that there was no evidence to support that. So then the... Don't interrupt. Sorry. And the question is whether there's evidence that would support some other award and making JAMAL inappropriate and a new trial appropriate. And so what's the other evidence, that both licenses were covered by... both patents were covered by a single license? That's about what you got, right? And that the value of that combined license was $10 million. Why is that enough? As well as Mr. Carter's testimony that it was these two patents that Covidian cared about and that was driving the value of the license for Covidian. I'm still just saying that those two patents account for the $10 million, but it doesn't tell the jury how to apportion between the two. Accepting your premise, because we think it does sufficiently do apportionment, but even if it didn't, the solution is a new trial. But when you say a new trial, do you automatically mean it would be a new trial on this record or that you should be allowed to reopen discovery? Because your brief says new trial, i.e., we can get reopened discovery and we can move forward on a new trial with new evidence and new witnesses. So that would be up to the district court, whether the district court reopens the discovery record. But we would submit that there is more than enough evidence in the record already below to support a reasonable royalty here, including the Kidder Report, which we think should be admitted, but that's a question for you. But that's a legal question before us. How does it change on the same record? How does anything change? You have a new trial, same record, same testimony, and we're back where we were before three years from now. In addition, we have the Covidian license, Mr. Carter's testimony that the 650 and the 892 patent drove the value of the Covidian license. We have Mr. Juergens, the technical expert for Rex Medical, who testified that the... So you're just a do-over of the trial as it was when you did it two years ago. If that, again, it's up to the district court, whether the district court could easily reopen discovery and allow any, to the extent there is an apportionment problem, be resolved quite easily in this case. But what this court's cases have held is that the only situation... Right, 284 says that a prevailing patent owner is entitled to a reasonable royalty, nothing less than a reasonable royalty. The rare exceptions are if the patent owner waives its right, which did not occur here, no one's arguing that, or if the record supports that conclusion. And here, the fact finder heard the evidence, the fact finder found a non-zero royalty. The only way that the district judge can overrule the fact finder and determine as a matter of law that there is a zero royalty under the Motorola case and other cases of this court is if the record compels the conclusion that zero is the only right. I think we're out of time. What's the other questions? All right. Commissioner Mills, we have two minutes left. Thank you, Your Honor. Very briefly, Your Honor, may it please the Court, on claim construction, because that's the only point that was raised, the district court got the claim construction right. This is a textbook case where the jury got it right as well. The district court's construction of plain meaning, where on the eve of trial, intuitive asked for some clarification about that plain meaning, and the judge provided it. She said it may include additional structure, but the plain meaning was absolutely the correct construction. Where Rex has now introduced this notion that anything below the web is the lower portion, that's entirely consistent with the argument that was made throughout the case. When questioned on the stand, Mr. Juergens, Rex Medical's expert, testified that every time, in every instance, he started with the claim language. Again, requires three distinct portions. He said he starts with the web. That's the thin portion in the middle. What's below it is the lower portion. What's above it is the upper portion. And there are clear pictures. Again, this is pointing to, there's the pictures in the patent, figures 14 and 15. But then also, when looking at it in the real-world circumstance, in looking at the short-form stapler that was the accused product, you look at appendix 12058 or page 36 of the yellow brief, there are images that show clear delineations between where Mr. Juergens started with the web, the lower portion below it, and the upper portion above it. Okay. Thank you. Thank you. Ms. Bosford, do you have a minute on the cross bill? Yes, Your Honor. I want to very briefly correct a misstatement from my original presentation. The invalidity was an affirmative defense, not a counterclaim. Again, we don't think that makes a key difference, but I did want to correct the record here. Just on claim construction, again, Rex is not defending the construction the district court actually issued. They are ignoring what happened. She did not simply instruct plain and ordinary, meaning 11835 of the appendix is where claim construction was given to the jury. The jury was instructed, quote, lower portion has its plain and ordinary meaning, which may include some additional materials or structures that extend in a perpendicular direction beyond the lower most sections of the beam. Again, there's no way for a jury to distinguish between those three different structures. And the patent not only distinguishes between the structures, gives each of them different functions. And so the problem with the district court's construction is that it reduces a claim that says the lower portion does this to an infringement read that says anything in the beam can do it. We'd ask the court to reverse that. Can I ask a damages question? Yes, Your Honor. How do you respond to the argument that evidence doesn't compel occlusion, that damages is zero? In other words, you know, assuming, okay, you've got a convenient license and you've got testimony that the drivers are the 650 and the 892. Assuming that's the only thing, one might think there's something, some value, maybe it's 2 million, maybe it's 5 million, I don't know. Why isn't that a good enough to require the trial judge to remit? A few responses, Your Honor. Number one, I'd urge the court to go back and look at what Mr. Carter actually said. He did not say that those two patents were the drivers of the license. In fact, he was prevented from testifying about a lot of the negotiations based on a FRE 408 issue. Similarly, all of the evidence that Rex cites in its brief, I walked through it, but I'm short on time. The evidence that they say about, you know, a market opportunity or something special about 60 millimeters or, you know, the 650 patent was really necessary. If you look at what they're citing, it simply does not say that. And on the legal point, it's not only if a reasonable, only if the record compels a conclusion of a zero royalty. This court said in Texac and the Third Circuit said in DevEx, if the patent owner fails to satisfy its burden to prove the amount of damages, then it gets nothing. Thank you, Your Honor. Okay. Thank all counsel. The case is submitted.